Alvin P. BLYER, Acting Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

NEW YORK COAT, SUIT, DRESS, RAIN-WEAR AND ALLIED WORKERS' UNION, INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO, Respondent.

No. 81 Civ. 4981.

United States District Court,
S. D. New York.

Sept. 24, 1981.

National Labor Relations Board, Joel E. Cohen, New York City, for petitioner.

Lewis, Greenwald & Oberman, Everett Lewis, Thomas Kennedy, New York City, for respondent.

Max Zimny, New York City, for International Ladies' Garment Workers' Union, AFL–CIO.

Herman E. Cooper, P. C., Jonathan L. Sulds, Herman E. Cooper, New York City, for Tahari Ltd.

## MEMORANDUM OPINION AND ORDER*

SOFAER, District Judge.

The National Labor Relations Board in this case seeks a preliminary injunction against picketing by the respondent New York Coat, Suit, Dress, Rainwear, and Allied Workers' Union, International Ladies Garment Workers' Union ("ILG"), pursuant to Section 10(*l*) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(*l*) (1976). An injunction will issue under section 10(*l*) according to the following procedure and standards: if, after preliminarily investigating a charge of an unfair labor practice under NLRA sections 8(b)(4), 8(b)(7), or 8(e), the NLRB official:

> has reasonable cause to believe such charge is true and that a complaint should issue, he shall . . . petition . . . for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief . . . as it deems just and proper. . . .

The section under which the Board is proceeding in this case is NLRA section

---

* This opinion is a revised version of an oral decision rendered by the Court on August 19, 1981.

8(b)(4)(D), 29 U.S.C. § 158(b)(4)(D) (1976), known as the "assignment of particular work" clause, which provides that

[i]t shall be an unfair labor practice for a labor organization . . . to engage in . . . a strike . . . or to threaten, coerce, or restrain any person . . . , where in either case an object thereof is . . . forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class.

Also involved in this case is a provision with which the courts of this Circuit are quite familiar, namely, the proviso in NLRA section 8(e) that exempts unions that service the garment industry from certain provisions of the Act. By its terms the garment-industry proviso applies to the unfair labor practices proscribed by section 8(e) ("hot cargo" agreements) and by section 8(b)(4)(B) (secondary boycotts). It does not, by its terms, apply to activity alleged to be unlawful under section 8(b)(4)(D), the assignment-of-work clause, and the Board's theory in this case rests on the argument that the section 8(e) garment-industry proviso does not immunize activity that otherwise constitutes an unfair practice under section 8(b)(4)(D).

The full extent of the Board's argument is unclear. The Board has not been willing in this proceeding to take the position that it will find a violation of section 8(b)(4)(D) in every work-assignment dispute that involves the garment industry. The Board may well adopt that position someday, but it has not articulated such a policy at this time.

Regardless of the NLRB's present or future interpretation of the garment-industry proviso, however, the full scope and impact of the proviso has not yet been definitively ascertained by the courts. Even so, it is established that the provision applies to more than sections 8(e) and 8(b)(4)(B). *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, I.L.G.W.U.*, 494 F.2d 1230, 1233–39 (2d Cir. 1974), held that the proviso applied to a practice alleged to be unlawful under section 8(b)(7) of the Act. Moreover, the parties point to no cases holding that a union claiming the protection of the garment-industry proviso could not invoke that clause in an 8(b)(4)(D) context. On the contrary, this case is a good example of why the garment-industry proviso should be held applicable to at least some forms of conduct alleged to be unlawful under section 8(b)(4)(D), and in particular to bona fide efforts to obtain so-called Hazantown or jobbers agreements, which prohibit the company from doing business with nonunion contractors.

The facts in this case are as follows. Prior to June 1, 1981, Tahari, Ltd. ("Tahari"), the employer, had what has been characterized as a sham jobber's agreement with Journeymens and Production Allied Services of America and Canada International Union, Local 157 ("Local 157"). Even the Board appears to recognize that it was an unenforced agreement, for the Board has not invoked that agreement in challenging respondent's conduct. Some of Tahari's contractors had agreements with the ILG; others had agreements with the New York Joint Board, Amalgamated Clothing & Textile Workers Union ("Amalgamated"); still others were nonunion shops, despite the then-extant jobber's agreement with Local 157.

The distribution of Tahari's work among Amalgamated, ILG, and nonunion shops prior to June 1 is hotly disputed. The Board has not yet adjudicated this matter. It has held no hearings and made no findings on this issue. The employer has submitted affidavits indicating a distribution of work primarily to Amalgamated, with some work to ILG, and some nonunion work. The ILG has submitted a contrary affidavit, based on detailed work sheets from Tahari business records, alleging a radically different distribution of work for the weeks prior to June 13. No party has offered witnesses on this issue.

In a section 10(*l*) proceeding, the district court must not substitute itself for the Board by holding a full-fledged trial

and making definitive factual findings. In any event, no hearing is necessary here. The undisputed facts permit a full evaluation of the legal issues presented for resolution. The record shows that the ILG had at least twenty percent of Tahari's work, that a significant amount of work was nonunion, and that at most sixty percent to eighty percent was in Amalgamated shops.

On June 1, 1981, ILG demanded that Tahari sign its standard jobber's agreement. At that time, ILG disclaimed any interest in representing Tahari employees represented by Local 157. On June 2, after Tahari refused to sign the jobber's agreement, ILG began picketing Tahari and some of its contractors. On June 17, ILG extended its picketing to four Tahari contractors represented by Amalgamated. Later on the day of June 17, Tahari and Amalgamated entered into a jobber's agreement. On June 24, Tahari filed a charge with the NLRB that ILG picketing was outlawed by the work-assignment clause, section 8(b)(4)(D), of the Act.

On July 8, ILG sent a telegram to Tahari disclaiming any intention to force it to assign to ILG shops work performed by Amalgamated contractors. That this telegram was sent is uncontroverted, and it relates to a second factual dispute in this case: the extent to which ILG sought work that had been assigned to Amalgamated before June 17. The Board has offered witnesses to testify that the ILG sought Amalgamated work and was unwilling to disclaim all Amalgamated work, particularly man-tailored ladies' jackets. On the other hand, the ILG insists that it has always been willing to disclaim taking any work previously assigned to Amalgamated and that it had invited Amalgamated to participate in its efforts to obtain a jobber's agreement from Tahari—which ILG asserts it would not have done had it intended to take work away from Amalgamated.

Here, again, it is important to observe that this Court does not sit in proceedings of this kind as a substitute for the Board, ready to resolve factual disputes going to the heart of the Board's theory as to why an unfair labor practice is being committed. The Board attorney argued in this case that ILG wanted to take work away from Amalgamated and that the ILG remains unwilling to commit itself not to take work from Amalgamated. Yet attorneys and principals of ILG expressly and on the record disclaimed any such intention.

The Board appears correct that a work-assignment dispute arose once Amalgamated and Tahari signed a jobber's agreement that provided that all work previously given to ILG shops would thereafter be assigned to Amalgamated shops. A work-assignment dispute therefore exists that at least theoretically comes within the prohibition of section 8(b)(4)(D). It is uncontroverted that ILG is seeking to get back the work that had been assigned to ILG prior to the June 17 picketing, for on July 28 Tahari and Amalgamated modified the June 17 jobber's agreement to require Tahari to send all work to Amalgamated contractors. At that point, a work-assignment dispute did arise, at least theoretically, between Amalgamated and ILG.

Furthermore, for purposes of this decision it is unnecessary to hear evidence on whether a work dispute arose earlier, when ILG began picketing Amalgamated shops. The Court is willing to assume that the Board would have presented witnesses who could have shown that the Board had a reasonable basis for believing that some ILG officials may have been seeking Amalgamated work. Even assuming that a work dispute existed at the earlier time, however, it is clear that that dispute did not arise until after ILG's picketing for a Hazantown agreement had begun, and it is equally clear that ILG now seeks only work that ILG previously performed as well as application to all Tahari subcontractors of the standards in the ILG jobber's agreement. Even these assumptions—the most favorable to the Board that could be justified by the present record—do not make it "just and proper" that an injunction issue in this case.

■ The standard for issuing a section 10(*l*) injunction requires the district court

to defer to the NLRB's preliminary determination of reasonable cause to believe that a picketing union, here ILG, is committing an unfair labor practice. But *Danielson* certainly rejected the proposition that the judiciary must abdicate to the NLRB's preliminary determination. *Id.* at 1239–45. Indeed, a section 10(*l*) injunction, like a section 10(j) injunction, is an extraordinary remedy, the issuance of which must be justified by special circumstances that warrant proceeding with an injunctive action before the Board has held its hearing and issued its decision. *See McLeod v. General Electric Co.*, 366 F.2d 847, 849–50 (2d Cir. 1966).

■ The Court must determine whether the NLRB has sufficient evidence and authority supporting its conclusion of reasonable cause. Although the NLRB need not demonstrate that it is *likely* that an unfair-labor-practice finding would ultimately be enforced by a court, the NLRB must demonstrate that it is reasonable to expect that such an unfair-labor-practice finding would be enforced by a court. Moreover, the Court must examine the extent to which the underlying facts have been determined.

■ In this case, the NLRB is proceeding on the basis of certain factual assumptions. Some evidence supports those factual assumptions, but other evidence in the record tends to contradict them. Furthermore, the determination of the Court on the reasonableness of the Board's position turns on the confidence with which the Court can evaluate that position. In the run-of-the-mill unfair labor practice case, as to which the NLRB has had time to develop standards and experience and to consider the policy ramifications of its position, a court should give great deference to the Board's determination. But in a case of first impression, in which the NLRB is using its preliminary-injunction power to develop new law, far less deference is appropriate. This point was made in *Danielson, supra,* at 1245, and has been held to render the issuance of a preliminary injunction under section 10(j) not "just and proper," *see McLeod, supra,* 366 F.2d at 850. Most recently, a panel in the Second Circuit stayed the issuance of a

preliminary injunction in a section 10(j) case because the NLRB was proceeding on the basis of a novel theory. *Silverman v. 40–41 Realty Associates, Inc.,* No. 81–7461 (2d Cir. oral argument July 14, 1981).

Involved in this case is a section of the law that expressly provides protection for the kind of activity involved here—picketing for a jobber's agreement in the garment trade. As *Danielson* held, moreover, the protection afforded by the garment-industry proviso of section 8(e) cannot meaningfully be restricted to the two unfair labor practices mentioned in that section.

In addition, ILG has placed on the record alternative grounds that provide reasonable bases for their conduct. Thus, ILG has made a reasonable case that its dispute over selection of subcontractors is not a work-assignment dispute within the meaning of Section 8(b)(4)(D). *See District No. 9, Int'l Ass'n of Machinists, A.F.L. and Anheuser-Bush, Inc.,* 101 N.L.R.B. 346 (1952). In addition, even if this became a work-assignment dispute on June 17, ILG is now at most trying to protect its own work. ILG has made a plausible argument here that its picketing to regain work that it has lost may be permissible under the work-preservation doctrine, as defined in *NLRB v. International Longshoremen's Ass'n, AFL-CIO,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980).

Other factors are also relevant to whether the section 10(*l*) standard has been met. First, even if this situation has some features of a work-assignment dispute under section 8(b)(4)(D), it is more than simply a work-assignment dispute. It is uncontroverted that, prior to the execution of the Tahari jobber's agreement on June 17, there could be no tenable claim that ILG violated section 8(b)(4)(D). The parties here recognized that Tahari's jobber's agreement with Local 157 was a sham. Consequently, the Board itself implicitly recognizes that the mere existence of a jobber's agreement does not preclude action by ILG that would be protected by the proviso of section 8(e). The June 1 picketing, therefore, was lawfully initiated for

purposes other than to obtain assignment of particular work or to protect against the loss of work. The purpose of the June 1 picketing was to obtain a jobber's agreement, which is exactly the reason Congress permitted this kind of garment-industry activity. The respondent ILG insists that it is still seeking to achieve that purpose.

More important, the type of conduct that ILG is involved in here—defensive conduct that follows a bona fide effort to obtain a jobber's agreement and responds to the target company's signing of a jobber's agreement with a union that is thereafter assigned the very work sought to be preserved by the picketing union—brings this case squarely within the purposes of the garment-industry proviso. If 8(e) were not construed to extend to such activity, an employer being picketed to sign a jobber's agreement could sign a contract with another union and then reward that union with the picketing union's work, thereby automatically creating a work-assignment dispute. The picketing union, which was initially seeking to obtain a jobber's agreement, would therefore lose both the right to attempt through picketing to regain its own work and the right to continue to seek a jobber's agreement. That scenario indicates why it seems untenable to read section 8(b)(4)(D) as unaffected by the garment-industry proviso of section 8(e). Section 8(e) should be read into section 8(b)(4)(D) at least to the extent necessary to preclude employers from enlisting rival unions to vitiate the protection established by Congress in the garment-industry proviso.

This is not to suggest that in other contexts—for example, when a union is involved in a classic work-assignment dispute and then seeks artificially to invoke the protection of section 8(e)—that a finding of a section 8(b)(4)(D) violation could not be made. But in this case, the respondent ILG began its picketing prior to any work-assignment dispute with Amalgamated.

The NLRB concedes that in some cases the garment industry proviso might protect picketing otherwise violative of 8(b)(4)(D). But it asserts that, because Amalgamated is a "legitimate" union, the proviso should not apply here. The NLRB suggests that it has the responsibility and the authority to make the determination that a union is legitimate and that, once such a union has signed a jobber's agreement with an employer, no other union can try to secure a jobber's agreement from that employer or to regain its work from the employer.

Congress has not granted the NLRB authority to make such a determination—not, at any rate, without a hearing and findings prior to enforcement. The purpose of the garment-industry proviso is to enable unions to prevent employers, whether acting in conjunction with other unions or acting unilaterally, from depressing the conditions of employment in the garment trade. ILG's papers in this case argue that, in the garment industry, a "legitimate" union may be an inadequate union, that an employer may enter into a jobber's agreement with a legitimate union that is less favorable to workers than the jobber's agreement pressed by ILG.

The NLRB has not suggested exactly how it will decide whether a garment union is so illegitimate that another union may picket to replace its jobber's agreement. The Board seems to believe that, as long as a jobber's agreement is being enforced and no work goes to nonunion shops, picketing by a rival union is barred. Yet ILG properly contends that, if the standard advanced by the Board were to govern, an employer could negotiate a deficient jobber's agreement with a "legitimate" union; in periods when masses of people come into this country who are available in the job market and willing to take low wages, the possibility exists that entirely legitimate unions will accept lower working standards and wages in order to obtain jobber's agreements. It is not for this Court to decide whether this possibility is healthy or unhealthy for the economy. Congress wanted the issue of which jobber's agreement is preferable to be decided in the labor marketplace by the efforts of workers, unions, and employers, not by the Board's views as to a union's legitimacy.

The affidavit of Samuel Nemaizer, General Manager of ILG, contains a detailed comparison of the ILG jobber's agreement and the Amalgamated jobber's agreement signed by Tahari. The analysis suggests that the ILG agreement contains many guarantees that are absent from the Amalgamated agreement. The affidavit also indicates that some of the employees who work for Tahari are still not covered by even the minimum guarantees for nonunion work despite the Amalgamated jobber's agreement. The Board cannot assert that there are no material economic differences between the jobber's agreement signed by Tahari and Amalgamated and the jobber's agreement sought by ILG. The only evidence before this Court is that ILG is pressing for a jobber's agreement that is materially different from and guarantees significantly better conditions to the employees who would be covered than does Amalgamated's jobber's agreement.

An additional and important equitable consideration in this case is that we are not dealing here with the kind of "innocent employer" that section 8(b)(4)(D) seeks to protect from injury during inter-union disputes. However meritorious Tahari's intentions have been Tahari is a jobber that used nonunion shops. Moreover, Tahari had a jobber's agreement with Local 157 that, because it was not enforced, was an insufficient basis for arguing that ILG's initial picketing was unprotected by the garment-industry proviso. The record strongly suggests that Tahari was able to enlist Amalgamated's cooperation as soon as ILG picketed Amalgamated shops; on that very day, after the picketing began, Tahari and Amalgamated signed their agreement. Tahari, in short, is not an innocent employer, unfairly caught in the crossfire between two unions.

Finally, in determining whether the issuance of an injunction prior to Board action is "just and proper," the district court must consider the interest in preserving the status quo. Cf. Seeler v. The Trading Post, Inc., 517 F.2d 33, 38 (2d Cir. 1975). In this case, ILG is seeking, insofar as its conduct pertains to a union work dispute, to restore the status quo of June 1, to recover the Tahari work that had been assigned to it prior to its effort to obtain a jobber's, or Hazantown, agreement. To issue the preliminary injunction sought by the Board would effectively prevent ILG from attempting to restore the status quo; of course, it would also prevent ILG from attempting to secure a more favorable jobber's agreement.

In this case, therefore, several considerations operate to warrant denying a preliminary injunction: there are two fundamentally important factual matters on which the Board has made no findings and to which the Board has not addressed itself in detail; Tahari had no jobber's agreement, even with a "legitimate" union, prior to June 1, 1981, and used nonunion shops; ILG's picketing began before a work-assignment dispute of any kind arose; if a work-assignment dispute exists now, it is a dispute in which ILG is seeking to regain its own work, which may well have been taken away from it because of its efforts to obtain a jobber's agreement; the jobber's agreement sought by ILG is materially different from, and stronger on its face than, the agreement entered into between Tahari and Amalgamated; the Board is proceeding on the basis of a novel theory, never before upheld by the courts, without any findings of fact and without having articulated the full scope of its new doctrine; and issuance of the injunction would prevent ILG from attempting through picketing to restore the status quo. Under these circumstances, the Board has not shown that it has reasonable cause to believe an unfair labor practice has occurred, and the Court concludes that it would be inequitable, unjust, and improper to grant a preliminary injunction. Therefore, the injunction is denied.

SO ORDERED.