R.M. PERLMAN, INC., d/b/a Rebecca Moses Collection and Rebecca Moses, Plaintiffs,

v.

NEW YORK COAT, SUIT, DRESS, RAIN-WEAR & ALLIED WORKERS' UNION LOCAL 89–22–1, ILGWU, et al., Defendants.

No. 91 Civ. 4828 (RLC).

United States District Court, S.D. New York.

Sept. 2, 1993.

Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for plaintiffs (Joel E. Cohen and Wendy K. Gelfand–Chaite, of counsel).

Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for defen-

dant Local 89–22–1 (Nicholas F. Lewis, of counsel).

Max Zimny, New York City, for defendant ILGWU (Brent Garren, of counsel).

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs R.M. Perlman Inc. d/b/a Rebecca Moses Collection ("RMC") and Rebecca Moses commenced this action pursuant to § 303(b) of the National Labor Relations Act of 1947 ("NLRA"), 29 U.S.C. § 187(b). They now move for partial summary judgment on the defendants' liability for damages which the plaintiffs allege they suffered as a result of the defendants' unfair labor practices. Defendants New York Coat, Suit, Dress, Rainwear & Allied Workers' Union, Local 89–22–1, I.L.G.W.U. ("Local 89–22–1") and International Ladies' Garment Workers' Union ("the International") cross-move for summary judgment dismissing the plaintiffs' amended complaint.

Plaintiff RMC, a fashion designer and wholesale vendor of women's garments, is a "jobber" in the garment industry. The term "jobber" refers to companies which design garments but do not actually produce the garments themselves. (Defendants' Joint Rule 3(g) Statement, ¶ 10; Plaintiffs' Joint Rule 3(g) Statement, ¶ 2). Production, including the cutting and sewing of the garments, is performed by independent companies known in the garment industry as "contractors" or "subcontractors." RMC sells the finished garments throughout the United States.

In April, 1989, Local 89–22–1 contacted RMC with the aim of convincing the designer to sign a "Hazantown Agreement," also known as a "Jobber's Agreement."[1] The plaintiffs did not agree to sign such an agreement, and in September, 1990, Local 89–22–1 began to picket outside the premises of RMC. The picket signs indicated that the union was seeking a Hazantown Agreement with RMC.

The parties met twice in October, 1990. At the second meeting Local 89–22–1 provided the plaintiffs with a copy of a broader collective agreement that included the provisions which comprise a Hazantown Agreement. Thereafter, Local 89–22–1 provided the plaintiffs with a copy of a model Hazantown Agreement.

The plaintiffs filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") on November 15, 1990, alleging that four provisions in the proposed Hazantown Agreement were unlawful under § 8(e) of the NLRA, 29 U.S.C. § 158(e), and that therefore Local 89–22–1's picketing violated § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). (Cohen Aff., Ex. 6). By letter dated December 3, 1990, Local 89–22–1 indicated to the plaintiffs that "any provision of the model agreement tendered to you is subject to good-faith collective bargaining." (Cohen Aff., Ex. 9). The plaintiffs responded that they were not willing to negotiate as long as the four clauses were "on the table." (Cohen Aff., Ex. 10).

On January 15, 1991, the Regional Director of the NLRB dismissed the plaintiffs' unfair labor practice charge. (Defendants' Joint Rule 3(G) Statement, Ex. A). On March 28, 1991, the General Counsel of the NLRB reversed the dismissal without explanation, and remanded the case for a hearing before an Administrative Law Judge. (*Id.,* Ex. B).

Local 89–22–1 ceased picketing in late March, 1991. In July, 1991, a settlement agreement of the NLRB proceeding was executed. The Union agreed not to picket RMC where an object of its picketing was to force RMC to enter into an agreement containing

---

**1.** A "Hazantown Agreement" or "Jobber's Agreement" is a type of collective bargaining agreement unique to the garment industry. Under such an agreement, the Union does not represent the employees of the jobber; rather, the agreement regulates the relationship between the jobber and contractors involved in the integrated process of producing the jobber's garments. In essence, the jobber agrees to use only unionized

contractors and to contribute to employee benefit funds on behalf of the contractors' employees. *See, e.g., Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union,* 494 F.2d 1230, 1231–1233 (2d Cir.1974) (term "Hazantown Agreement" apparently originated from this case where union picketed Hazantown, Inc. with object of persuading company to sign a Jobber's Agreement).

the four clauses. The settlement agreement states that signing shall not constitute an admission by Local 89–22–1 that it violated the NLRA. (Cohen Aff., Ex. 23). Also in July 1991, the plaintiffs commenced this action to recover damages resulting from the defendants' alleged unlawful picketing.

### I. *Garment Industry Proviso*

The parties dispute whether four clauses in the model Hazantown Agreement which Local 89–22–1 presented to the plaintiffs are protected by the garment industry proviso to § 8(e) of the NLRA. Both parties believe the court can decide this conflict by summary judgment. Pursuant to Rule 56(c), F.R.Civ. P., summary judgment is appropriate where there is no genuine issue of material fact; the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

■ Section 8(e) of the NLRA prohibits a union and an employer from entering into any express or implied agreement, often called "hot cargo" agreements, whereby the employer promises a union not to do business with other employers who refuse to operate under union contracts.[2] Congress provided two exemptions in § 8(e) to the ban on hot cargo agreements, the garment industry and construction industry provisos. The garment industry proviso states as follows:

> [F]or purposes of ... [§ 8(e) and § 8(b)(4)(B)] the terms "any employer," "any person engaged in commerce or an industry affecting commerce," and "any person" when used in relation to the terms "any other producer, processor, or manufacturer," "any other employer," or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor or subcontractor working on the goods or premises of the jobber or manufacturer or *performing parts of an integrated process of production in the apparel and clothing industry....* 29 U.S.C. § 158(e) (emphasis added).[3]

The plaintiffs acknowledge that RMC is a "jobber" within the meaning of § 8(e), and concede that all but the four challenged clauses of the Hazantown Agreement are protected by the garment industry proviso. According to the plaintiffs, however, the four clauses are facially overbroad because each, for various reasons, restricts RMC's dealings with third persons and entities even where such persons are not contractors or subcontractors "performing parts of an integrated process of production in the apparel and clothing industry."[4]

---

2. Section 8(e) provides in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void.... 29 U.S.C. § 158(e); *see National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 634–37, 87 S.Ct. 1250, 1262–64, 18 L.Ed.2d 357 (1967); *Local 210, Laborers' Int'l Union v. Labor Relations Div. Associated Gen. Contractors,* 844 F.2d 69, 72–73 (2d Cir.1988).

3. The garment industry proviso in effect preserved the lawful status of Jobber's Agreements, now called Hazantown Agreements. *See Danielson,* 494 F.2d 1230; *Jou–Jou Designs v. I.L.G.W.U.,* 643 F.2d 905, 909–910 (2d Cir.1981)

(Hazantown Agreements are affirmatively sanctioned by the garment industry proviso). Congress attributed the decrease of sweatshops to the union practice of entering into hot cargo agreements with jobbers. *Id.* at 1233–1236. The relevant Congressional debates and reports are at 105 Cong.Rec. 17327 (August 28, 1959) (remarks by Sen. John Kennedy); *id.,* at 17381 (August 31, 1959) (remarks by Senators Javits and Goldwater, Sr.); *id.,* at 15539 (August 11, 1959) (memorandum by Reps. Thompson and Udall); *id.* at 16590 (August 20, 1959) (memorandum by Sen. Kennedy and Rep. Thompson) *reprinted in* 2 NLRB, Legislative History of the Labor–Management Reporting and Disclosure Act of 1959, pp. 1377, 1385, 1576, 1708 (1959) (hereinafter "2 Leg. Hist.").

4. Virtually no case law defines the scope of the garment industry proviso. *Danielson,* 494 at 1236 n. 9 (garment industry proviso has not been subject of much litigation). The few attempts to define its scope establish that the production process is "integrated" where the jobber or man-

Similar versions of each of the four challenged clauses appeared in collective bargaining agreements between I.L.G.W.U. affiliates and multi-employer associations in the dress, cloak and skirt industries in 1959 when the garment industry proviso was adopted, as well as in many other contracts throughout the United States covering workers in other branches of the garment industry. (Aff. of Walter Mankoff, Assoc. Director of I.L.G.W.U. Research Dept., I.L.G.W.U. binder, Ex. 12, ¶¶ 4, 5). The legislative history of the garment industry proviso contains numerous statements from Congressmen that the exemption was intended to permit the I.L.G.W.U. and its local affiliates to continue their "present unionization practices throughout the integrated process of production." *Danielson*, 494 F.2d at 1235.[5] Therefore, although the plaintiffs' specific attacks on each of the four clauses will be carefully explored below, there is a strong presumption that these provisions were part of the status quo Congress intended to protect in enacting the garment industry proviso.

Although the NLRB did not reach a decision on the merits regarding the four clauses at issue, it has established some basic rules of construction for determining whether a collective bargaining clause is facially overbroad and not within the protection of the construction industry proviso. *Donald Schriver, Inc. v. N.L.R.B.*, 635 F.2d 859, 886 (D.C.Cir.1980) (deference must be given to the NLRB's interpretation of the NLRA); *Blyer v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union*, 522 F.Supp. 723, 727 (S.D.N.Y.1981) (Sofaer, J.) (same). The NLRB has found clauses challenged as facially overbroad to be lawfully restricted to on-site construction work, as required by the construction industry proviso,[6] even though the challenged clause itself is not explicitly limited to on-site work. In such cases, the NLRB looks to whether the parties and or related clauses of the agreement manifest an intent to so restrict the clause. *See, e.g., General Teamsters, Local 982 (J.K. Barker Co.)*, 181 NLRB 515, 517–520 (1970), *enf'd*, 450 F.2d 1322 (D.C.Cir.1971); *Southern Cal. District Council of Hod Carriers*, 158 NLRB No. 28, 303, 305 (1966); *Ets–Hokin Corp.*, 154 NLRB No. 52, 839, 841 (1965), *enf'd*, 405 F.2d 159 (9th Cir.1968).[7]

▌ These rules of construction should be equally applicable to determining whether a clause is protected by the garment industry proviso. Thus, with respect to the garment industry proviso, a clause is not facially overbroad simply because it is not expressly limited to instances where a contractor or subcontractor is working on "the goods or premises of the jobber" or where the employer is "performing parts of an integrated process of production." 29 U.S.C. § 158(e). Rather, the parties' intent and related clauses must be considered. Since the four clauses at issue are contained in a Hazantown Agree-

ufacturer retains extensive control over and is intimately involved with the design, production and distribution of garments produced by one or more contractors or subcontractors, and is not merely a purchaser, seller or shipper of finished garments. *See Geoffrey Beene, Inc. v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union*, 562 F.Supp. 1316, 1322 (S.D.N.Y.1983) (Sofaer, J.); *Furriers Joint Council of New York*, 261 N.L.R.B. 701, 1982 WL 24483 (1982).

5. *See* 105 Cong.Rec. 17899 (Sen. Kennedy explains that the proviso is necessary "to avoid serious damage to the pattern of collective bargaining" in the clothing and apparel industry); *id.* at 17381 (Sen. Javits states concern is to avoid "interference with already established and legitimate union practices" in the garment industry); *id.* (Sen. Goldwater states conferees "do not intend to upset the status quo of the garment and apparel industries"); 2 Leg.Hist. 1387 (Colloquy between Senators Mansfield and Goldwater re-

garding "exempting the clothing and garment trades so they can continue on the same basis on which they operate at the present time."); *see also, Local 210*, 844 F.2d at 70 (if practice was part of status quo in construction industry in 1959, Congress in drafting construction industry proviso meant to protect it).

6. The construction industry proviso to § 8(e) permits hot cargo agreements "in the construction industry relating to work to be done at the site of the construction...." 29 U.S.C.A. § 158(e).

7. In *J.K. Barker*, for example, the NLRB found a clause which governed "*all* work performed by the contractor, or subcontractors, and *all* services rendered for the contractor and subcontractors" to be limited to on-site work based on its relationship to another clause in the agreement which was expressly limited to "work to be done *at the site* of the construction." 181 NLRB at 520 (emphasis added).

ment, which as a whole applies only to job-bers within the garment industry, the plain-tiffs have a tough task in proving that the clauses are intended to apply to entities out-side the integrated process of production in the garment industry. *See Jou–Jou Designs v. I.L.G.W.U.*, 643 F.2d 905, 909–910 (2d Cir.1981) (Hazantown Agreements are affir-matively sanctioned by garment industry proviso).

### 1. *Continuing Obligations Clause*

■ The plaintiffs challenge Article Fourth, the "Continuing Obligations Clause," which states as follows:

> The Employer and its transferee, suc-cessors and assigns shall be bound by and be personally and individually liable for the performance of all of the provisions of this agreement during its entire term.
>
> The Employer shall not enter into *any* partnership or consolidate or merge with or become the successor or assign of an-other person, firm or corporation unless the resulting firm assumes all accrued and future obligations to the Union and the benefit funds towards which payments are required to be made under this agreement on the total gross amount paid or due to his contractors. (Cohen Aff., Ex. 4) (em-phasis added).

The flaw with this clause, according to the plaintiffs, is that should RMC, as the "Em-ployer," enter into a partnership or merge with a firm, the clause would require the new entity to assume RMC's contributions to Un-ion benefit funds even if the new entity is not a jobber involved in the "integrated process of production" within the garment industry.

While the Continuing Obligations Clause is not expressly limited to situations in which the successor to RMC is a jobber or manu-facturer involved in an "integrated process of production," any other understanding of the Clause is senseless. First, the Clause must be read in conjunction with Article Fifteenth which establishes how contributions to Union benefit funds are calculated. Article Fif-teenth expressly states that the amount to be contributed to the benefit funds is a percent-age of the total amount paid by "the jobber" to each of its contractors. (Cohen Aff., Ex. 4

at 20). Thus, a successor to RMC could only assume "future obligations" to the Union benefit funds, as required by the Continuing Obligations Clause, if it is also a jobber that farms out production work on its garments to contractors.

The Continuing Obligations Clause would also require RMC's hypothetical successor to perform "all provisions" of the Hazantown Agreement. In general, the Agreement's provisions can only be performed by a jobber involved in the integrated process of produc-tion. For example, Article Sixth provides, "Whenever the Employer produces garments in the shops of contractors it shall deal with and give work only to such contractors as are in contractual relations with the Union." (Cohen Aff., Ex. 4 at 4). "Employer" is defined at the beginning of the Agreement as an entity "engaged as a jobber in the produc-tion of garments." (*Id.* at 1).

Clearly, the Continuing Obligations Clause accomplishes the lawful objective of prevent-ing a jobber from evading its obligations under the Hazantown Agreement by a mere shift of corporate form in cases where the new entity is still engaged in the integrated process of production. *See Geoffrey Beene, Inc. v. N.Y. Coat Suit, Dress, Rainwear and Allied Workers' Union*, 562 F.Supp. 1316, 1322–1324 (S.D.N.Y.1983) (Sofaer, J.). It is complementary to Article Fifth which calls for appointment of an Impartial Chairman to resolve disputes over whether new entities are in reality successors or subsidiaries of the Jobber by looking for evidence of the Jobber's intent to evade the Agreement by or through the new entity. (Cohen Aff., Ex. 4 at 3).

The plaintiffs presented no facts showing that Local 89–22–1 intended to apply, or has applied, the Continuing Obligations Clause to bind successors not involved in the integrat-ed process of production. *See e.g., J.K. Barker, infra*, 181 NLRB at 520. Indeed, the only concern expressed by plaintiff Re-becca Moses regarding the Clause was that it "was not an attractive clause for future inves-tors, *especially those in the industry already* who were not affiliated with the I.L.G.W.U." (Dep. of Deborah Moses, ILGWU binder, Ex.

8 at 10) (emphasis added). Based on the foregoing analysis, the Continuing Obligations Clause is not overbroad.

### 2. *Trimmings Clause*

■ The plaintiffs attack as overbroad the second paragraph of Article Seventh, the "Trimmings Clause," which states:

Whenever the Union notifies the Employer that it has belts, covered buttons, buckles, neckwear, artificial flowers, bias binding, tubular piping, embroideries or shoulder pads manufactured or caused to be manufactured by, or has hemstitching, pleating and tucking on garments or any other accessories done or caused to be done or manufactured by, or is *purchasing* such articles or services *from contractors* which are not in contractual relations with International or any of its affiliates, or against whom the International or an affiliate thereof has declared a strike or with whom any of them has a labor dispute, the Employer shall cease further dealings until the strike is settled and/or the contractor enters into an agreement with the International or an affiliate thereof. (Cohen Aff., Ex. 4) (emphasis added).

The plaintiffs concede that a clause requiring a jobber to have "made-to-order" trimmings "manufactured" only by union contractors would be protected by the garment industry proviso. The Trimmings Clause, however, also regulates a jobber's "purchases" of "ready-made" trimmings which, by definition, are not made pursuant to a jobber's specifications. The plaintiffs argue that such purchases are not part of the "integrated process of production" unless the seller is also sewing the trimmings onto the jobber's garments, and that the Clause is not restricted in its application to such sellers.

The plaintiffs' argument would have some merit but for the fact that the Trimmings Clause expressly applies only to purchases of trimmings from sellers who are "contractors." A jobber is free to purchase ready-made trimmings from sellers who are not contractors, for the Clause is only applicable "whenever" a jobber decides to purchase trimmings from a contractor. Article First of the model Hazantown Agreement defines

"contractor" as "one who manufactures garments from cut or uncut goods for a manufacturer or jobber." (Cohen Aff., Ex. 4 at 2). Thus, to the extent the Clause regulates purchases of ready-made trimmings, the sellers of those trimmings will be participants in the integrated process of production since they must be "contractors."

This understanding of the Clause is supported by the third paragraph of Article Seventh which discusses the relationship of jobber and contractor when the two are engaged in an "integrated process of production." (*Id.* at 5). Therefore, the Trimmings Clause is protected by the garment industry proviso, and is not overbroad.

### 3. *Struck Work Clause*

■ The plaintiffs also challenge the fourth paragraph of Article Seventh, the "Struck Work Clause," which states:

*To the extent permitted by law,* it shall not be considered a breach of this agreement on the part of the Union or the International or on the part of any worker of any of its contractors if such worker refuses to cross *any* picket line recognized by the Union or the International or to enter upon the picketed premises of the contractor, either of his own violation or by direction of the Union or the International. (Cohen Aff., Ex. 4) (emphasis added).

A jobber agreeing to this clause is consenting to waive its right to recover damages from the defendants if they engage in primary or secondary picketing against a contractor performing work for the jobber. A jobber might be injured by such picketing if, for example, a contractor's employees refuse to cross the union's picket line, and as a result the contractor's work on the jobber's garments is held up.

The plaintiffs contend the Struck Work Clause is overbroad because the language "any picket line" forces them to waive damages resulting not only from secondary picketing permitted by the garment industry proviso but also from illegal secondary picket-

ing.[8] In particular, the plaintiffs claim the Clause would enable the union to picket contractors used by RMC with the object of affecting the contractors' dealings with "any" firm with whom the union has a dispute even if the offending firm is not part of the "integrated process of production." According to the plaintiffs, the garment industry proviso would only protect a clause which requires them to waive damages resulting from refusals by contractors' employees to cross any "lawful" picket line.

 Under § 8(b)(4)(B) of the NLRA all secondary picketing is illegal.[9] 29 U.S.C. § 158(b)(4)(B); *Kaynard v. Local 282, Int'l Bhd. of Teamsters*, 576 F.2d 471, 473, n. 1 (2d Cir.1978). However, because of the reference to § 8(b)(4)(B) in the garment industry proviso secondary picketing considered illegal in other industries is permitted within the garment industry both to secure and to enforce Jobber's Agreements to cease doing business with nonunion contractors and subcontractors working on the goods or premises of the jobber or performing parts of the integrated process of production. *Danielson*, 494 F.2d at 1235–1236; *Construction, Prod. & Maintenance Laborers Union, Local 383 v. N.L.R.B.*, 323 F.2d 422, 424–425 (9th Cir.1963). Thus, even after a jobber has signed a Hazantown Agreement, the union is legally entitled to picket contractors used by the jobber if it has a dispute with that contractor, with a different jobber for which that subcontractor performs work, with a subcontractor performing work for that contractor, or even with the same jobber if he breaches the Hazantown Agreement. *See Id.* at 1235.

Since the Struck Work Clause is contained within a Hazantown Agreement and is qualified by the phrase "to the extent permitted by law," it can only be interpreted as involving lawful primary and secondary picketing against contractors involved in the integrated process of production in the garment industry. *See e.g., J.K. Barker, infra*, 181 NLRB at 520. The third paragraph of Article Seventh itself contains explicit reference to the "integrated process of production." (Cohen Aff., Ex. 4 at 5). The Struck Work Clause is merely a restatement of the law, that the union, unlike unions is other industries, is legally entitled to conduct secondary picketing even after a Hazantown Agreement is signed. Moreover, without this clause a jobber signing the Hazantown Agreement might conclude that the union was agreeing to give up its right to enforce the Agreement by secondary picketing due to Article Twentieth of the Agreement, the arbitration provision which governs disputes between the union and the jobber. (Cohen Aff., Ex. 4 at 31–35).

### 4. *Trucking Provision*

 Finally, the plaintiffs challenge Article Eighteenth, the Trucking Clause, which states:

> To the extent permitted by law, the Employer shall have all of its *trucking of garments and of cut and uncut goods* done exclusively by workers who are employed in collective bargaining agreements with Local 102, I.L.G.W.U., which are observed and fully complied with. (Cohen Aff., Ex. 4) (emphasis added).

---

**8.** Secondary picketing occurs whenever union pressure is "brought to bear, not 'upon the employer who alone is a party [to a dispute with the union], but upon some third party who has no concern in it' with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." *NLRB v. Local 825, Int'l Union of Operating Engineers*, 400 U.S. 297, 303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971) (footnote omitted); *Kaynard v. Local 282, Int'l Bhd. of Teamsters*, 576 F.2d 471, 473, n. 1 (2d Cir.1978).

**9.** Section 8(b)(4) makes it an unfair labor practice for unions to engage in strikes, picketing or concerted refusals to handle goods or perform services or to threaten, coerce, or restrain any

person engaged in commerce where an object thereof is as follows:

> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.... 29 U.S.C. § 158(b)(4)(B).

Because the Trucking Clause is limited "to the extent permitted by law," it is not facially unlawful provided some lawful application is possible.

The plaintiffs contend trucking is not part of the "integrated process of production," so there is no lawful application of the Clause. Although the plaintiffs maintain there is nothing in the legislative history to suggest trucking was meant to be protected by the garment industry proviso, they provide no analysis of the legislative history and rely solely on NLRB decisions interpreting the construction industry proviso.[10] The defendants concede not all trucking is protected by the garment industry proviso, and admit the union has made no effort to enforce the Trucking Clause for "many, many years." (Byer Aff., ¶ 44). Nonetheless, they believe delivery and pick-up of cut and uncut goods between jobbers, contractors and subcontractors is part of integrated process of production.

Certainly, from the legislative history some types of trucking may be ruled out as unprotected by the garment industry proviso. A typical example of what Congress viewed as the "integrated process of production" in the garment industry is described by Representative Teller:

> The jobber is engaged in the manufacture of dresses. He buys piece goods. He employs designers to design the garments and perhaps cutters to cut the goods. But the dresses are not sewn and finished in his own shop. Instead the jobber sends out the cut goods or sometimes the uncut goods, to contractors whose workers sew and complete the dresses according to the jobbers' specifications. Then the contractor sends the finished dresses back to the jobber who sells them to the trade. 2 NLRB, Legislative History of the Labor–Management Reporting and Disclosure Act of 1959, 1680 (August 13, 1959) (hereinafter "2 Leg. Hist."); see also 105 Cong. Rec. 17381 (Sen. Javits) (August 31, 1959).

Thus, the concept of an "integrated process of production" does not appear to apply to any activity after the garments are sent back to the jobber in finished form. For example, trucking of finished garments by a jobber to purchasers or retailers would not be part of the "integrated process of production." [11]

Trucking of cut and uncut goods between jobbers, contractors and subcontractors is within the scope of the proviso, however, because at that stage the goods are still in the process of production and have not yet been transformed into garments, the finished product. For example, piece goods received by a jobber might be delivered to a cutting contractor to be cut into pieces, and from there to a contractor for embroidery, and finally to sewing contractors to be sewn into finished garments.

This understanding of the proviso is consistent with Congress' aim in enacting the proviso, preventing the easy avoidance of unionization which was being accomplished through abandonment of "inside shops" for contractor shops.[12] Truck drivers perform

---

**10.** The NLRB decisions are inapposite, for they are based upon the precise language of the construction industry proviso which is quite different from the garment industry proviso. The proviso by its terms only protects hot cargo agreements regarding contracting of "work to be done *at the site* of the construction," 29 U.S.C. § 158(e) (emphasis added), and the N.L.R.B. decisions hold that delivery of materials "to" a construction site does not constitute "on-site" work. *See e.g. Teamsters Local 559 (Conn. Sand & Store Corp.)*, 138 N.L.R.B. 532 (1962); *General Truck Drivers, Warehousemen and Helpers, Local 89*, 254 N.L.R.B. 783, 786, 1981 WL 20251 (1981). By contrast, the garment industry proviso is broader covering the "integrated process of production." 29 U.S.C. § 158(e).

**11.** The N.L.R.B. concluded in *Furriers Joint Council of New York*, 261 N.L.R.B. 701, 705,

1982 WL 24483 (1982), that the garment industry proviso extends only to the "process of production and not to the transportation, shipping or selling of garments." The NLRB held that jobbers in the fur coat business were not "jobbers" within the meaning of the garment industry proviso because they did not "contribute to the manufacturing process," rather they were only responsible for assisting retailers in the purchase of "finished" garments. 261 N.L.R.B. at 705. Thus, in finding that the production process did not extend to transportation, the NLRB was referring to transportation of finished garments, not to trucking of cut and uncut goods that will eventually be transformed into finished garments.

**12.** As explained by the Second Circuit:
> Garment manufacturers, in an effort to avoid unionization, largely abandoned their 'inside

the same type of work in the jobber-contractor setting as did forklift drivers and materials handlers when the industry operated through "inside shops." Forklift drivers and materials handlers were regular production workers responsible for moving piece goods to the various sewing and cutting divisions of the factory. Since sewing and cutting is now done off the factory premises at contractors' shops, truck drivers are needed to move the goods.

As with the other three clauses, it is significant that Trucking Clauses were part of the status quo in the garment industry in 1959. (Mankoff Aff., I.L.G.W.U. binder, Ex. 12). Speaking on behalf of the conference committee, Senator Goldwater explained, "We know full well the very complicated manner in which this complicated industry works.... [W]e do not intend to upset the status quo of the garment or apparel industries." 105 Cong.Rec. 17381.

However, it is unlikely that truck drivers employed by independent trucking or delivery companies are protected by the proviso because such companies cannot be classified as one of the four types of entities protected by the proviso. Section 8(e) exempts only "jobbers," "manufacturers," "contractors," and "subcontractors" from the ban on hot cargo agreements. 29 U.S.C. § 158(e). As Congress understood the integrated process, "jobbers" or "manufacturers" design and sometimes cut goods while "contractors" and "subcontractors" perform work on the goods. *See e.g.* 105 Cong.Rec. 17381 (Senator Javits). Therefore, for the proviso to be applicable, the truck drivers must be employees of contractors or subcontractors participating in the integrated process of production.

In sum, the Trucking Clause, although inartfully drafted, is protected by the garment industry proviso because of its limiting language "[t]o the extent permitted by law."

Without this language, the Trucking Clause might well be regarded as overbroad because it purports to apply to trucking of "garments" in addition to trucking of "cut and uncut goods." Insofar as the garment industry proviso protects trucking, it only applies to trucking of cut and uncut goods, not to trucking of garments, and even then only to truck drivers who are employees of contractors or subcontractors participating in the integrated process of production.

## II. *Damages for Unlawful Union Conduct*

The plaintiffs claim they are entitled to recover damages under § 303 of the NLRA for the defendants' unlawful conduct. Section 303 imposes liability on a union if plaintiffs are injured "by reason of" union conduct defined as an unfair labor practice in § 8(b)(4) of the NLRA. 29 U.S.C. § 187(b). Picketing where "an object thereof" is forcing an employer to enter into any agreement prohibited by § 8(e) of the NLRA is regarded as an unfair labor practice under § 8(b)(4). 29 U.S.C. § 158(b)(4). Since the four clauses of the Hazantown Agreement challenged by the plaintiffs are within the scope of the garment industry proviso and therefore are not barred by § 8(e), the picketing by Local 89–22–1 was not unlawful. Thus, the plaintiffs are not entitled to damages.[13]

## III. *Conclusion*

For the foregoing reasons, the plaintiffs' motion for summary judgment is denied, and the defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

---

shops,' transformed themselves into jobbers, and then engaged contractors to do the actual manufacturing. 'The jobber had no direct dealing with employees, was not responsible to them for wages, and was unconcerned with hours and adequate standards.' *Danielson*, 494 F.2d at 1234 (quoting *Greenstein v. National Skirt & Sportswear Ass'n, Inc.*, 178 F.Supp. 681, 687–688 (S.D.N.Y.1959) (Weinfeld, J.)).

**13.** The court need not consider the plaintiffs' third claim that defendant I.L.G.W.U. ratified Local 89–22–1's conduct and is therefore responsible for the local union's actions. This claim would only be relevant if the court were awarding the plaintiffs damages for unlawful conduct by Local 89–22–1.