R.M. PERLMAN, INC., doing business as Rebecca Moses Collection, and Rebecca Moses, Plaintiffs–Appellants,

v.

NEW YORK COAT, SUIT, DRESSES, RAINWEAR & ALLIED WORKERS' UNION LOCAL 89–22–1, I.L.G.W.U., AFL–CIO; Samuel Byer, as General Manager of N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union Local 89–22–1, I.L.G.W.U.; International Ladies' Garment Workers' Union and Jay Mazur, as President of the International Ladies' Garment Workers' Union, Defendants–Appellees.

No. 1213, Docket 93–9079.

United States Court of Appeals, Second Circuit.

Argued March 8, 1994.

Decided Aug. 18, 1994.

146

Joel E. Cohen, New York City (Mudge Rose Guthrie Alexander & Ferdon, of counsel), for plaintiffs-appellants.

Thomas M. Kennedy, New York City (Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., of counsel), for defendant-appellee New York Coat, Suit, Dress, Rainwear & Allied Workers' Union, Local 89–22–1, ILGWU.

Brent Garren, New York City (Max Zimny, of counsel), for defendant-appellee International Ladies' Garment Workers' Union.

Before: CARDAMONE, PRATT and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

We review on this appeal a special proviso inserted in a federal statute to preserve certain union practices believed helpful in combating the blight of sweatshops in the garment industry. Sweatshops may be defined as businesses that regularly violate wage, child labor, safety and health laws. These establishments, which pay workers below living wages for long hours of work under intolerable conditions, have existed in the United States for over 100 years. The evils associated with sweatshops were brought to the public's attention forcibly in 1911 by the tragic fire at the Triangle Shirtwaist Factory in New York City where 150 women who were trapped inside the factory lost their lives. As a result of public outrage, union activity on behalf of garment workers—supported by federal law—ensued.

Plaintiffs R.M. Perlman, Inc., doing business as Rebecca Moses Collection; and Rebecca Moses appeal from a judgment of the United States District Court for the Southern District of New York (Carter, J.) entered September 14, 1993, 833 F.Supp. 238, denying plaintiffs' motion for summary judgment, granting defendants' cross-motion for summary judgment and dismissing plaintiffs' complaint that sought damages from the New York Coat, Suit, Dress, Rainwear, and Allied Workers' Union Local 89–22–1 and the International Ladies' Garment Workers' Union pursuant to § 303(b) of the National Labor Relations Act of 1947, as amended, 29 U.S.C. § 187(b) (1988).

## BACKGROUND

### A. *Facts*

R.M. Perlman, Inc., a fledgling fashion designer and wholesale vendor of women's apparel, and Rebecca Moses (collectively Perlman or plaintiffs) commenced operations in January 1988 by marketing a line of designer sportswear under the "Moses Collection" label. In fashion industry parlance, Perlman is known as a "jobber." Its product is manufactured by "contractors" who employ production workers. The jobber designs the garments and turns the design specifications over to a contractor who integrates the fabric and other materials into completed garments. The finished goods are returned to the jobber, who then sells them to retailers, specialty shops and other buyers. Perlman utilized both union and nonunion contractors to make its garments.

In April 1989 the New York Coat, Suit, Dress, Rainwear, and Allied Workers' Union Local 89–22–1 (Local) learned that Perlman was using contractors that employed production workers represented by the International Ladies' Garment Workers' Union (I.L.G.W.U. or International). The Local

corresponded with Perlman and urged it to enter into what has become known as a "jobber's or Hazantown agreement." "Hazantown agreement" is a term derived from *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1231–32 (2d Cir.1974), a case in which the jobber's name was Hazantown, Inc. We ruled in *Danielson* that secondary picketing to achieve a jobber's agreement was not an unfair labor practice. *See id.* at 1236; *Jou–Jou Designs, Inc. v. I.L.G.W.U.*, 643 F.2d 905, 907 (2d Cir.1981). A Hazantown agreement regulates the relationship between a jobber and its contractors, requiring the jobber to hire only those contractors whose employees are members of the I.L.G.W.U. Such an agreement has no effect on the relationship between a jobber and its own employees. Thus, Perlman's 15 employees—designers, samplemakers and sales and administrative staff—were not the target of the Local's efforts to have the employer enter such an agreement.

Nearly a year and a half later, without further discussion regarding the sample jobber's agreement it had sent to Perlman in April 1989, the Local began picketing Perlman in September 1990, to induce it to sign the agreement. At a meeting to discuss this subject Perlman expressed reservations because it had worked with union contractors who were unable to meet its quality and/or delivery specifications. Plaintiffs had several other concerns about entering into a jobber's contract: potential pension fund withdrawal liability, liability for liquidated damages for imported production, and the possibility that the clause forbidding it from using nonunion truckers might subject it to an unfair labor practice charge.

On October 23, 1990 the Local sent Perlman a copy of a model jobber's agreement, which Perlman said it would not sign. It proposed instead a different type of contract, one permitting it to use both union and nonunion contractors in the same percentages in the future as it had in the past, and not to be held responsible for direct contributions to the employee pension fund. A few days later the Local informed Perlman its suggestions were unacceptable and that the Local would picket a fashion show featuring the Moses Collection scheduled to begin the following Monday at the Plaza Hotel in New York City. This seasonal fashion show, attended by major retailers and representatives of international fashion publications, is the key to a fashion designer's ability to sell its line. In addition—because of plaintiffs' refusal to sign a jobber's agreement—the Local informed union contractors that they would be in violation of their labor contracts if they assembled garments for Perlman. Reports of Perlman's dispute with the Local appeared in both *Women's Wear Daily* and *New York Woman*, publications with wide readership in the garment trade.

As a consequence of the Local's actions, Perlman filed an unfair labor practice charge against it with the National Labor Relations Board (Board). Plaintiffs complained, pursuant to the National Labor Relations Act of 1947, as amended, 29 U.S.C. § 158(b)(4)(A) (1988) (Act), that the Local was picketing to obtain Perlman's signature on a jobber's agreement that contained four clauses in violation of § 8(e) of the Act, 29 U.S.C. § 158(e). Those clauses are:

Article Fourth: Employer's Continuing Obligations

The Employer and its transferees, successors and assigns, shall be bound by and be personally and individually liable for the performance of all of the provisions of this agreement during its entire term.

The Employer shall not enter into any partnership or consolidate or merge with or become the successor or assign of another person, firm or corporation unless the resulting firm assumes all accrued and future obligations to the Union and the benefit funds towards which payments are required to be made under this agreement on the total gross amount paid or due to his contractors.

Article Seventh: Struck Work—Labor Dispute

(Trimmings Clause)

2. Whenever the Union notifies the Employer that it has [trimmings, belts, buttons, buckles, etc.] or any other accessories ... manufactured by, or is purchasing such articles or services from contrac-

tors which are not in contractual relations with [the] International or any of its affiliates, or against whom the International or an affiliate thereof has declared a strike or with whom any of them has a labor dispute, the Employer shall cease further dealings until the strike is settled and/or the contractor enters into an agreement with the International or an affiliate thereof.

Article Seventh: Struck Work—Labor Dispute

4. To the extent permitted by law, it shall not be considered a breach of this agreement on the part of the Union or the International or on the part of any worker of any of its contractors if such worker refuses to cross any picket line recognized by the Union or the International or to enter upon the picketed premises of the contractor, either of his own violation or by direction of the Union or the International.

Article Eighteenth: Trucking

To the extent permitted by law, the Employer shall have all of its trucking of garments and of cut and uncut goods done exclusively by workers who are employed in collective bargaining agreements with Local 102, I.L.G.W.U., which are observed and fully complied with.

In response to the unfair labor practice charge, the Local assured Perlman that the recited clauses in the proposed jobber's agreement were subject to good faith collective bargaining, and that "no provision in the agreement ... represent[ed] an absolute to the Union." Even after receiving these assurances, Perlman refused to bargain further unless the Local removed the offending clauses. As the parties were at an impasse, resolution of this dispute was left to the Board.

The Board's Regional Director dismissed Perlman's charge, finding the clauses did not violate § 8(e) of the Act and, even if they did, the Local was not insisting on, but simply negotiating for, them. Perlman appealed to the Board's General Counsel, who sustained the appeal and remanded the case to the Regional Director with instructions to issue an unfair labor practice complaint against the Local and to make a determination based on record testimony developed before an administrative law judge. No hearing was ever held.

Instead, in June 1991 the Regional Director approved a settlement between Perlman and the Local, under which the latter, without admitting it violated the Act, agreed to refrain from picketing or otherwise threatening, coercing or restraining Perlman where the object of such actions was to force Perlman to sign an agreement containing the offending clauses. This settlement prompted the International to notify its local affiliates to clarify and reword the Employer's Continuing Obligations clause and the Struck Work—Labor Dispute clauses, including the Trimmings clause, and to remove the Trucking clause from it jobber's agreements. After the picketing of plaintiffs terminated in March 1991, the Local elected not to bargain further with Perlman. Perlman has since gone out of business.

### B. *Prior Proceedings*

In July 1991 plaintiffs filed a complaint in the Southern District of New York, pursuant to § 303(b) of the Act, 29 U.S.C. § 187(b), against the Local and its General Manager, and the International and its President (collectively defendants), seeking recovery of damages sustained by Perlman as a result of the "unlawful picketing and other violent and intentionally malicious activity of defendants." In addition, Perlman set forth claims based on state law causes of action, specifically *prima facie* tort, several counts of intentional interference with contractual relations, and defamation.

In a published opinion Judge Carter dismissed the state law causes of action and also dismissed both the General Manager of the Local and the President of the International as parties to the action. *See R.M. Perlman Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89–22–1*, 789 F.Supp. 127, 133 (S.D.N.Y.1992). The case proceeded against the Local and the I.L.G.W.U. Subsequently, plaintiffs moved for partial summary judgment on the violation of § 303(b) of the Act and for a trial on damages. Defendants cross-moved for sum-

mary judgment and dismissal of the remaining federal count.

By judgment entered September 14, 1993 Judge Carter granted defendants' cross-motion for summary judgment and dismissed Perlman's complaint. He held in a second published opinion that the Continuing Obligations clause and the Trimmings clause were not overbroad and that because the Struck Work clause and the Trucking clause as set forth in the proposed jobber's agreement were prefaced by the words "[t]o the extent permitted by law," they too were lawful. *See R.M. Perlman, Inc. v. New York Coat, Suit, Dress, Rainwear & Allied Workers' Union Local 89–22–1*, 833 F.Supp. 238, 243–47 (S.D.N.Y.1993). Thus, since defendants had not committed an unfair labor practice, plaintiffs were not entitled to damages. *See id.* at 247. Having found the contested clauses did not violate the Act, the district court did not address whether the International was liable to Perlman for ratifying the Local's activity. *See id.* at 247 n. 13.

On appeal, plaintiffs challenge the district court's ruling that the contract clauses were lawful. They insist the clauses are facially overbroad because each clause would restrict Perlman's business dealings with entities that are not part of the integrated process of production. Plaintiffs also maintain that because these four clauses were unlawful, defendants' actions in support of their demand for a contract containing these clauses constituted an unfair labor practice in violation of § 8(b)(4)(A) of the Act, entitling them to damages.

## DISCUSSION

### I Standard of Review

Plaintiffs seek review of a grant of summary judgment to defendants pursuant to Fed.R.Civ.P. 56(c). The Rule states that a district court may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see generally Gallo v. Prudential*

*Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (recounting rules for granting summary judgment). We review the grant of summary judgment *de novo. See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 146 (2d Cir.1993).

### II Statutory Framework

Section 303(a) of the National Labor Relations Act makes it unlawful for a labor organization to engage in conduct defined as an unfair labor practice in § 8(b)(4) of the Act. *See* 29 U.S.C. § 187(a). Section 8(b) of the Act, insofar as here pertinent, makes it an unfair labor practice for a labor organization

(4)(i) to ... induce ... any individual employed by any person ... in an industry affecting commerce to ... refus[e] in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten ... any person ... in an industry affecting commerce, where ... an object thereof is—

(A) forcing or requiring any employer ... to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person....

29 U.S.C. § 158(b)(4).

Subsection (e) of § 8 states

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter contain-

ing such an agreement shall be to such extent unenforcible [sic] and void....

29 U.S.C. § 158(e).

■ Contracts that violate § 8(e) of the Act are commonly referred to as "hot cargo agreements." The expression derives from the language of § 8(e) barring an employer and union from entering into an agreement under which the employer ceases handling or otherwise dealing with the products of other employers. The goods agreed not to be handled are therefore rendered "too hot to handle," and such a forbidden agreement is aptly called a "hot cargo" agreement. *See Geoffrey Beene, Inc. v. New York Coat, Suit, Dress, Rainwear & Allied Workers' Union,* 562 F.Supp. 1316, 1321 (S.D.N.Y.1983) (section prohibits agreements between unions and employers providing that employees will not handle goods of certain employers, rendering their goods "hot cargo"); *Danielson,* 494 F.2d at 1233; *see also The Developing Labor Law,* 1313–14 (Patrick Hardin ed., 3d ed. 1992).

There are two significant exceptions to § 8(e): the Construction Industry Proviso and the Garment Industry Proviso.

The Construction Industry Proviso states

[N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work....

29 U.S.C. § 158(e). This proviso created an exemption from the ban on "hot cargo" agreements because Congress wanted to "preserve the *status quo* in the construction industry." *National Woodwork Mfrs. Ass'n v. N.L.R.B.,* 386 U.S. 612, 637, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357 (1967). The *status quo* included maintaining restrictive subcontracting clauses found in collective bargaining agreements which limited an employer's ability to contract with nonunion or nonsignatory contractors for work to be done at a construction site. *See Local 210, Laborers' Int'l Union v. Labor Relations Div. Associated General Contractors of Am.,* 844 F.2d 69, 76

(2d Cir.1988). The reason for limiting an employer's ability to contract was to avoid the sort of conflict and confrontation that might occur at a work-site where union and nonunion members were employed. *See id.* This exception to the general bar on "hot cargo" contracts also recognized the community of interests inherent in the construction industry, where the wages and working conditions of one set of employees often affected those of another. *See Woelke & Romero Framing, Inc. v. N.L.R.B.,* 456 U.S. 645, 661–63, 102 S.Ct. 2071, 2080–82, 72 L.Ed.2d 398 (1982).

The Garment Industry Proviso, the other exception to the Act's ban on "hot cargo" agreements—and the one which is the subject of this appeal—provides

[F]or the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or *performing parts of an integrated process of production* in the apparel and clothing industry....

29 U.S.C. § 158(e) (emphasis supplied). The Garment Industry Proviso creates a broader exception than the Construction Industry Proviso. *See Local 210,* 844 F.2d at 73 n. 1.

If the challenged clauses in the instant case do not fall within the Garment Industry Proviso, plaintiffs may be entitled to damages pursuant to § 303(b) of the Act. This follows because the offending clauses would violate § 8(e)'s ban on "hot cargo" agreements and § 8(b)(4)(A)'s prohibition against "labor trouble or other economic retaliation" to obtain such a provision in a labor contract. *N.L.R.B. v. I.B.E.W.,* 405 F.2d 159, 163 (9th Cir.1968), *cert. denied,* 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969).

A. *Legislative History*

The Garment Industry Proviso was enacted against a historical backdrop that bears repeating because it sheds light on why the exemptions from the otherwise barred "hot cargo" clauses in labor contracts came into being. In the early 1900s, garment manufacturing in New York City, where the industry was then mostly concentrated, was performed primarily in "inside shops." The operator of such a shop would design the garments, hire the production workers who would assemble them, and market the completed line of apparel. *See Abeles v. Friedman,* 171 Misc. 1042, 1045–46, 14 N.Y.S.2d 252 (1939). The industry was fiercely competitive, keeping profit margins slim or nonexistent. The workers, mostly newly arrived immigrants, worked for depressed wages under sweatshop conditions; it was these conditions that prompted the birth of the International Ladies Garment Workers' Union.

Through negotiation with the inside shop operators, the International and its affiliated locals were able to make improvements in the garment workers' working conditions and raise their standard of living. But, to avoid being unionized, many inside shop operators stopped making their own goods and instead contracted the work of assembling garments to outside contractors with materials the operator supplied. The former inside shop operators then became known as jobbers. The jobber considered itself separate from and not responsible for the employees of the outside contractors that actually manufactured its garments. Because the outside contractors were also keenly competitive for business, the garment workers they employed also suffered from low wages and poor working conditions. *See Greenstein v. National Skirt & Sportswear Ass'n, Inc.,* 178 F.Supp. 681, 687 (S.D.N.Y.1959), *appeal dismissed,* 274 F.2d 430 (2d Cir.1960); *In re General Assignment for Benefit of Creditors of Larry Jay, Inc.,* 3 A.D.2d 386, 389, 160 N.Y.S.2d 790 (1st Dep't 1957), *aff'd without opinion,* 4 N.Y.2d 912, 174 N.Y.S.2d 662, 151 N.E.2d 93 (1958). To obtain the protection and benefits of union membership the contractor's employees put pressure on jobbers to farm out their work only to contractors who were unionized. The competition spilled over to the various locals representing garment workers who tried to influence jobbers to outsource production only to contractors represented by that particular local. *See Jou-Jou Designs, Inc.,* 643 F.2d at 906.

As discussed in *Danielson,* 494 F.2d at 1234–35, the union practice of pressuring jobbers into signing Hazantown agreements was the subject of extended debate in Congress in 1959 during consideration of the Landrum–Griffin amendments to the National Labor Relations Act. The Landrum–Griffin proposal contained an absolute ban on "hot cargo" agreements. But during discussions in the House, Congressmen Landrum and Griffin stated that their proposed bill then under consideration was not intended to alter the practices of the garment industry. *See* 105 Cong.Rec. 15848–49 (1959) (remarks by Representatives Teller of New York, Landrum of Georgia and Griffin of Michigan).

But there was widespread concern in Congress that garment industry practices conflicted with such a total ban. In discussing Senate compromises to the bill, then Senator John F. Kennedy observed the Senate required some limitation on the bill's ban on secondary boycotts pertaining to the garment industry; that is, the future President said, while production is subcontracted, the industry is highly integrated and unions use clauses in their labor contracts to insure that jobbers do not contract work out to sweatshops. This socially desirable contractual right, he concluded, is one the unions must have to prevent chaos in the industry. *See* 105 Cong.Rec. 17327 (1959) (remarks by Sen. Kennedy of Massachusetts); *see also* 105 Cong.Rec. 17381 (1959) (remarks by Sen. Goldwater of Arizona) ("We conferees are in the very peculiar position of everyone of us agreeing that we do not intend to upset the *status quo* of the garment or apparel industries."). As capsulized by Senator Javits of New York, "it is readily felt that the elimination of sweatshops in [the garment and clothing] industries is heavily attributable to this method of proceeding to unionization through the fact that there is an integrated production process." 105 Cong.Rec. 17381 (1959).

Ultimately, as a result of this bi-partisan concern the Garment Industry Proviso was enacted as part of the Landrum–Griffin bill. *See* Labor–Management Reporting and Disclosure Act of 1959, Pub.L. No. 86–257, 73 Stat. 519 (1959). Its purpose was to preserve the lawful status of jobber's agreements in the garment industry, giving them the sanction of law. *See Jou–Jou Designs, Inc.*, 643 F.2d at 909–10.

### B. *Integrated Process of Production*

■ Given this history, the key to understanding the Garment Industry Proviso is its reference to the "integrated process of production in the apparel and clothing industry." 29 U.S.C. § 158(e). This phrase is illustrated by the common practice of the jobber retaining exclusive control over the design and marketing of the apparel, and the contractor manufacturing the garment according to the jobber's specifications. The unique phraseology exempts jobbers' agreements from the secondary boycott and "hot cargo" prohibitions of the Act. It had long been so understood. The secondary boycott ban prevented a union from injuring a third party uninvolved in the labor dispute. It was not aimed at the garment industry where the third party was, in effect, acting as primary employer. *See* 95 Cong.Rec. 8709 (1949) (remarks by Sen. Taft of Ohio). Thus, although the jobber and contractor cannot be considered a single employer for all purposes, the integrated process of production results in a symbiotic relationship between them.

Article Eighth, Paragraph A, of the model jobber's agreement reflects this concept. It notes the "close unity of interest" that exists among workers in the garment industry, and concludes that in a labor dispute regarding work performed on its garments "the Employer and its contractors are not 'neutrals' with respect to each other but are jointly engaged in an integrated process of production." The Garment Industry Proviso and the term integrated process of production are to be construed in a manner that will advance the legislative purpose of the garment industry exemption to § 8(e) of the Act.

■ In sum, §§ 8(b)(4) and 8(e) of the Act establish a sliding scale of permissibility with respect to agreements to cease doing business with certain entities: "(1) As to the garment industry, picketing to secure and to enforce is permissible; (2) as to the construction industry, picketing to secure is permissible but (under § 8(b)(4)(B)) picketing to enforce is proscribed; (3) as to all other industries, picketing both to secure and to enforce is proscribed." *Construction, Prod. & Maintenance Laborers Union, Local 383 v. N.L.R.B.*, 323 F.2d 422, 425 (9th Cir.1963). Thus, if the clauses at issue implicate activities that fall within the integrated process of production, the Garment Industry Proviso applies and therefore secondary picketing to secure adoption of such provisions is lawful.

### III   Methodology

■ Perlman does not contend the entire Hazantown agreement violates §§ 8(e) and 8(b)(4)(A) of the Act; it challenges only the four recited clauses as being unlawful on their face. Had the Board held a hearing and ruled on the merits of Perlman's contentions, we would have given deference to its determination. *See Donald Schriver, Inc. v. N.L.R.B.*, 635 F.2d 859, 886 (D.C.Cir.1980) (Board's interpretation of Construction Industry Proviso entitled to considerable deference), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981); *see also N.L.R.B. v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) ("The Board's resolution of . . . conflicting claims . . . is entitled to considerable deference.").

Because the Board neither held a hearing, nor made any ruling on the merits, to resolve the appeal before us we must use the standard adopted by the Supreme Court in *National Woodwork Mfrs. Ass'n*, 386 U.S. at 644–45, 87 S.Ct. at 1268–69. That standard examines the objectives of the Local and the surrounding circumstances to decide whether proffering of the four objectionable clauses was secondary or primary in nature. A brief analysis of *National Woodwork* will make the test clear. In that case a manufacturers association filed an unfair labor practice charge against a local carpenter's union because the labor agreement provided that un-

ion members would not handle premachined doors. When a general contractor ordered such doors to be installed at a job site, union members refused to hang them. The manufacturers association alleged the "will not handle" provision of the collective bargaining agreement violated §§ 8(e) and 8(b)(4)(B) of the Act. *See id.* at 614–16, 87 S.Ct. at 1252–54.

In determining whether the clause had a primary or secondary objective, the Supreme Court focused on the union's purpose in including the clause in the labor agreement. It ruled that the union's purpose is primary in nature if the clauses were designed to preserve or protect the work of the affected employees; if to satisfy union objectives elsewhere, the union's purpose is secondary in nature and therefore objectionable. *See id.* at 644–45, 87 S.Ct. at 1268–69; *see also Local 210*, 844 F.2d at 73 (if agreement intended to influence the labor relations of a third party, it has secondary goals barred by § 8(e) unless falling within one of the provisos); *Berman Enters. Inc. v. Local 333, United Marine Div.*, 644 F.2d 930, 937 (2d Cir.) (asking "whether the provisions that the Union sought were aimed at preserving work and maintaining working conditions or whether they were tactically calculated by the Union to satisfy its objectives elsewhere" to determine if a § 8(b)(4) violation occurred), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981); *N.L.R.B. v. Local Union No. 28, Sheet Metal Workers' Int'l Ass'n*, 380 F.2d 827, 830 (2d Cir.1967) (§ 8(e) violated "only where an agreement not to use the products of another employer is designed to bring pressure on *that* employer with respect to *his* employees") (emphasis in original).

■ If the objected to clauses condone secondary boycotts, we follow the Board's methodology—used in construing the Construction Industry Proviso—to determine whether the clauses fall within the safe harbor of the Garment Industry Proviso. Under this approach, where the meaning of a clause is plain, we may determine its validity. If unlawful on its face—hence, not exempt under the Garment Industry Proviso—it makes no difference how a Local intended to apply the clauses. *See Bricklayers & Stone*

*Masons Union, Local No. 2*, 224 N.L.R.B. 1021, 1025 (1976), *enforced*, 562 F.2d 775 (D.C.Cir.1977). Where the plain meaning of the clause indicates it is not clearly unlawful, it is to be read as requiring no more than the law allows. On the other hand, where a clause is ambiguous, unlawfulness will not be presumed; instead, extrinsic evidence will be examined to decide whether it was intended to be administered in a primary or lawful manner or in a secondary or unlawful fashion. *See General Teamsters, Chauffeurs, Warehouseman and Helpers, Local 982*, 181 N.L.R.B. 515, 517 (1970) [hereafter *Local 982* ], *aff'd sub nom., Joint Council of Teamsters No. 42 v. N.L.R.B.*, 450 F.2d 1322 (D.C.Cir.1971).

In applying this standard each clause must be analyzed in light of the entire jobber's agreement presented to Perlman on October 23, 1990. Hazantown agreements, as earlier noted, have the imprimatur of the law and the Garment Industry Proviso is aimed at strengthening the I.L.G.W.U.'s hand in continuing its unionization efforts throughout the integrated production process, without being restricted in those activities by the Landrum–Griffin Act. *See Danielson*, 494 F.2d at 1235 (quoting 105 Cong.Rec. 16428 (1959) (statement of Sen. Javits of New York)). We proceed now to an individual analysis of each of the four Hazantown clauses.

## IV The Hazantown or Jobber's Agreement

### A. *Article Fourth: Employer's Continuing Obligations Clause*

■ The first of these is Article Fourth—The Employer's Continuing Obligations Clause. The terms of this clause bind the employer and its transferees, successors and assigns both personally and individually to the terms of the jobber's agreement. Perlman contends that were it to enter into a partnership with another party and the resulting entity was *not* part of the integrated process of production, the new entity could continue to do business in its new field—outside the garment industry—only if it assumed the obligations contained in the jobber' agreement, including its obligations to make payments to the benefits funds. The

benefits funds provisions of Article Fifteenth are based on a percentage of the amount paid or due a contractor for work performed for the jobber.

We are not persuaded by the new entity argument. By definition, a jobber's agreement affects only the relationship between jobbers and its contractors within the integrated process of production. It has nothing to do with the relationship between jobbers and others with which it does business or with which it forms a new business, if those entities are not involved in the integrated process of production. Read in conjunction with the benefit funds provisions of Article Fifteenth, the Continuing Obligations Clause is restricted in its application only to those subsequently-formed entities that remain jobbers involved in the integrated process of production. Unless the new entity is so engaged, it will incur no benefits liability because such liability is premised upon work that a contractor performs for a jobber. Similarly, the new entity could not incur any wage liability unless it were part of the integrated process of production and had enlisted a contractor to manufacture its apparel. This same analysis, in fact, holds true for any activity in which the new entity is engaged.

On its face, the object of an employer's continuing obligations clause appears to impact a secondary party—one not bound by the terms of the labor agreement—and thus is subject to § 8(e)'s ban on "hot cargo" agreements. See National Woodwork Mfrs. Ass'n, 386 U.S. at 644–45, 87 S.Ct. at 1268–69. But the clause is saved by the Garment Industry Proviso because its terms, read within the context of the jobber's agreement, may only operate against a new entity that is a part of the integrated process of production. The clause, as the district court recognized, prevents a jobber from avoiding its Hazantown obligations by a change in its corporate form, when in reality the new entity continues to be engaged in the integrated process of production. See R.M. Perlman, Inc., 833 F.Supp. at 243.

It was Congress' purpose, as earlier observed, to continue those union practices aimed at eradicating the scandalous sweatshop culture existing in the garment and apparel industries when § 8(e) was passed. Where a clause such as the employer's continuing obligations clause is not clearly unlawful on its face, we construe it to require no more than the law allows. See Local 982, 181 N.L.R.B. at 517. Perlman hypothesizes that the Local would apply the clause to an entity that does not engage in the integrated production process. A close reading of the clause does not support its hypothesis. Because such a reading would not be lawfully permitted, we do not construe it in that fashion.

B. *Article Seventh: Struck Work—Labor Dispute (Trimmings Clause)*

■ Perlman contends the next clause, Article Seventh, the Trimmings Clause, does not allow it to purchase trimmings from another firm if that firm is not an International signatory, or if a Local affiliate has a dispute with it. The clause is overbroad, plaintiffs assert, because it does not differentiate between a firm involved in the integrated process of production or a vendor from which Perlman purchases pre-made or non-specification goods. Article Sixth of the model jobber's agreement states that "[w]henever the Employer produces garments in the shops of contractors it shall deal with and give work only to such contractors as are in contractual relations with the Union." The Trimmings Clause is not overbroad on its face. Perhaps it is ambiguous and because it might therefore have the potential of affecting a secondary party's labor relations, it comes within the "hot cargo" prohibition of § 8(e) of the Act. See Local 210, 844 F.2d at 73. The question that must be answered then is whether such an ambiguous clause is protected by the Garment Industry Proviso.

Article First, Paragraph 4 of the model jobber's agreement, which the Local sent to Perlman on October 23, 1990, defines "contractor" as "one who manufactures garments from cut or uncut goods for a manufacturer or jobber." The reference to "contractor" in the Trimmings Clause suggests the Local intended the clause to apply solely within the integrated process of production. But the verbiage of the Trimmings Clause appears to give "contractor" a broader meaning by in-

cluding not only the purchasing of services from a contractor, but also the purchasing of articles. Hence, the Definition Clause and the Trimmings Clause define "contractor" somewhat differently and thereby create an ambiguity. Had the Trimmings Clause stated Perlman was barred from purchasing pre-made trimmings from a vendor or a supplier, we would agree that the clause was over-broad on its face and in conflict with § 8(e), notwithstanding the Garment Industry Proviso.

■ As stated earlier, when a clause is ambiguous, we examine extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner. The Local presented evidence that trimmings clauses have been in jobber's agreements for at least 25 years. Such longevity is helpful in discerning intent, but not dispositive on the issue of lawfulness. *See A.P.A. Transp. Corp.*, 239 N.L.R.B. 1407, 1409 n. 9 (1979). Perlman presented no evidence to show the Local had ever intended to use these trimmings clauses unlawfully. The Local asserts the clause has never been applied to off-the-shelf belts, buttons, buckles, neckwear, etc., and was "intended to apply only to such items that are specifically manufactured to be part of a particular garment and even with respect to such items, this clause has only rarely been invoked by the Union."

Perlman insists that the International's letter containing suggested revisions to the Trimmings Clause constitutes evidence that the original clause was unlawful. In the first place, we treat the International's letter to its affiliated Locals recommending the contentious clauses be reworded or removed as a subsequent remedial measure. As such, it is not probative of the International's intent to apply the Trimmings Clause in an unlawful manner. *See* Fed.R.Evid. 407 ("When, after an event, measures are taken, which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct. . . ."); *see also SEC v. Geon Indus., Inc.*, 531 F.2d 39, 52 (2d Cir.1976); 2 *Weinstein's Evidence* ¶ 407[01] n. 4 (1993). In addition, the letter and its suggested rec-

ommendations are irrelevant with respect to the Local's lawful or unlawful aim, as plaintiffs have not produced any evidence that the Local did in fact change its agreements with other jobbers.

No evidence suggests the Local intended to apply the ambiguous Trimmings Clause in an unlawful manner. To the contrary, the statement submitted by the Local that it intended that clause to apply only within the integrated process of production has not been controverted. We therefore hold that the Trimmings Clause does not violate § 8(e) of the Act.

### C. *Article Seventh: Struck Work—Labor Dispute*

■ Perlman asserts the other contested clause of Article Seventh, the Struck Work—Labor Dispute Clause, is unlawful because this clause forces it to waive damages resulting from secondary picketing that is lawful under the Garment Industry Proviso, and also compels it to waive damages from unlawful secondary picketing. The clause affects the labor relations of a third party through secondary picketing. In order for us not to deem it an unfair labor practice to picket to secure this clause in an agreement, the clause must fall within the Garment Industry Proviso. Because the Garment Industry Proviso exempts those involved in the integrated process of production from the prohibitions of § 8(b)(4)(B) of the Act, secondary picketing both to secure and enforce a jobber's agreement is allowed. *See Danielson*, 494 F.2d at 1236.

■ Even after a jobber has signed a jobber's agreement with the Local, the Local has the right to picket a contractor used by the jobber if it has a dispute with that contractor, or with a different jobber for which that contractor performs work, or with a subcontractor performing work for that contractor. *See id.* at 1235. Illegal secondary picketing in violation of § 8(b)(4) of the Act could occur were the union to picket a Perlman contractor with the object of affecting that contractor's dealings with another firm, assuming that other firm was not part of the integrated process of production.

Nonetheless, we think Article Seventh must be interpreted in light of its introductory phrase: "[t]o the extent permitted by law." Perlman relies on *Red Star Exp. Lines, Inc. v. N.L.R.B.*, 196 F.2d 78 (2d Cir.1952), *N.L.R.B. v. Gaynor News Co.*, 197 F.2d 719 (2d Cir.1952), *aff'd sub nom., Radio Officers' Union of Commercial Tels. Union v. N.L.R.B.*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954) and *N.L.R.B. v. Gottfried Baking Co.*, 210 F.2d 772 (2d Cir.1954), for the proposition that our prior precedents have held such a "savings clause" to be inoperative to transform an otherwise unlawfully overbroad clause into a lawful one.

We do not view this qualifying phrase as a "savings clause." Instead, it is a limitation on the applicability of the Article as a whole. *Red Star Exp. Lines, Inc.* dealt with a union security provision made illegal under the then newly-enacted Taft–Hartley Act. In an attempt to "save" the provision, the parties inserted an addendum to their collective bargaining agreement, which stated in substance that pending clarification of the legality of clauses in their 1944 labor contract such clauses would be considered null and void, but if and when declared legal would be in full force and effect. *See* 196 F.2d at 80. In invalidating this "saving" provision, we held the vague language of the addendum did not put an ordinary employee on notice that the union security provision had been suspended. *See id.* at 81.

In *Gaynor News Co.*, a union security provision—illegal by its terms—was invalidated. The contract contained a separate, general "savings clause," which stated that should any of its provisions conflict with federal or state law, "then such provision shall continue in effect only to the extent permitted." 197 F.2d at 723 n. 1. We agreed with the Board that the effect of such a general clause did not defer the provisions' applicability, but simply postponed the question of its legality to the future. *See id.* at 723. And, in *Gottfried Baking Co.*, we ruled invalid a similar union security provision that was unlawful on its face. *See* 210 F.2d at 777–80.

The facts of the instant case are distinguishable from these cases. In them the "savings clauses" were set forth in separate provisions of the labor contract, not as a preface to the actual contract clause at issue. The present case is more like *Lewis v. Quality Coal Corp.*, 270 F.2d 140 (7th Cir.1959), *cert. denied*, 361 U.S. 929, 80 S.Ct. 369, 4 L.Ed.2d 353 (1960). There the Seventh Circuit examined a clause that said: "It is further agreed that as a condition of employment all employees shall be, or become, members of the United Mine Workers of America, *to the extent and in the manner permitted by law . . . .*" *Id.* at 142 (emphasis in original). *Lewis* conceded that without this limiting language the provisions of the agreement would violate 28 U.S.C. § 158, but ruled that "the qualifying phrase 'to the extent and in the manner permitted by law' expressly modifies and limits the application of the clause . . . so that any requirement it imposes is conditioned on conformity to existing or future law." *Id.*

As in *Lewis*, the scope of this Struck Work—Labor Dispute Clause is limited by its very language "[t]o the extent permitted by law." Because it prefaces the clause, there would be no need for a signatory of the contract to search through all the contract's terms to see if there is a general clause that might limit the Struck Work—Labor Dispute Clause. The preface conditions the clause's applicability on its conformity to present or future law. When not clearly unlawful on its face, a clause is read to require no more than what the law allows. *See Local 982*, 181 N.L.R.B. at 517. We hold therefore that the Struck Work—Labor Dispute Clause of the jobber's agreement is not unlawful on its face because it limits secondary picketing to what is lawful under the Act.

### D. *Article Eighteenth: Trucking Clause*

■ We pass to the final objected to clause, Article Eighteenth, Trucking Clause, which is somewhat more problematic than the preceding clauses. Perlman maintains this clause is overbroad in that trucking is not part of the integrated process of production and, as it previously urged, the phrase "[t]o the extent permitted by law" does not "save" it. Plaintiffs point out that the Local, in a letter to the Board, conceded it "would be hard put to establish that trucking even

between a jobber and his contractors is part of the integrated production process" and admitted "the enforcement of the trucking clause might well be held not 'permitted by law.'" The Local went on in the same letter to assure the Board that it had made "no effort to enforce the trucking clause for many many years" and the only reason the clause was still contained in the model jobber's agreement was because both company and union negotiators followed the rule that "if it ain't broke, don't fix it."

Plaintiffs rely on *Teamsters Local Union No. 559*, 138 N.L.R.B. 532 (1962), for the proposition that trucking is not part of the integrated process of production. In that case, the Board found that a company's business of delivering building materials at a construction site did not fall within the protection of the Construction Industry Proviso. *See id.* at 535; *see also Essex County & Vicinity Dist. Council of Carpenters and Millwrights v. N.L.R.B.*, 332 F.2d 636, 640 (3d Cir.1964) (Construction Industry Proviso "does not extend to other agreements such as those relating to subcontracts for supplies and materials to be transported to and delivered on the construction site"). It must be kept in mind that these decisions construed the Construction Industry Proviso which, as pointed out before, is read more narrowly than the Garment Industry Proviso. *See Local 210*, 844 F.2d at 73 n. 1; *Danielson*, 494 F.2d at 1236. The former exemption is specifically limited to *"work to be done at the site* of the construction, alteration, painting, or repair of a building, structure, or other work." 29 U.S.C. § 158(e) (emphasis added).

The latter proviso, on the other hand, provides a somewhat broader exemption from the "hot cargo" provision of the Act because it applies to jobbers, manufacturers, contractors and subcontractors *"performing parts of an integrated process of production* in the apparel and clothing industry." *Id.* (emphasis added). We are persuaded that this clause could lawfully apply to trucking firms engaged in transporting cut and uncut goods between a jobber and its contractor, as such movement of goods could reasonably be considered to be a necessary part of the integrated process of production.

Nonetheless, the Trucking Clause could not lawfully apply to trucking finished apparel to retail vendors, as the garments at that stage would be complete, and not in the process of production. Such trucking activity would be outside the legislative scheme envisioned by the enactment of the Garment Industry Proviso. Were it not for the phrase "[t]o the extent permitted by law," the Trucking Clause would be overbroad on its face because it permits secondary activity not otherwise exempted under the Garment Industry Proviso. *See National Woodwork Mfrs. Ass'n*, 386 U.S. at 644–45, 87 S.Ct. at 1268–69.

Yet, as discussed earlier with relation to the Struck Work—Labor Dispute Clause, the phrase "[t]o the extent permitted by law" has the effect of qualifying and conditioning this clause and limiting its application to what is lawful under the Act. The Trucking Clause of the jobber's agreement therefore does not violate § 8(e) on its face because the qualifying phrase limits it to those trucking activities associated with the integrated process of production.

## CONCLUSION

Accordingly, we affirm the district court's grant of summary judgment to defendants because as a matter of law the four clauses plaintiffs object to fall within the Garment Industry Proviso. In holding these clauses not prohibited by § 8(e) of the Act, it necessarily follows that plaintiffs are not entitled to damages under § 303(b), 29 U.S.C. § 187(b).

Affirmed.